Slip Op. 11–89

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| KAHRS INTERNATIONAL, INC., | |
| Plaintiff, | |
| v. | **Before: Gregory W. Carman, Judge** |
| UNITED STATES, | Court No.  07-00343 |
| Defendant. | |

[*Plaintiff's motion for summary judgment on the eighth cause of action and request for oral argument denied; Defendant's motion for summary judgment on the fifth and eighth causes of action granted*]

Law Offices of George R. Tuttle, A.P.C. (<u>Michael J. Tonsing</u>, <u>Carl D. Cammarata</u>, <u>George R. Tuttle</u>, <u>Stephen S. Spraitzer</u>), for Plaintiff.

<u>Tony West</u>, Assistant Attorney General, <u>Barbara S. Williams</u>, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (<u>Mikki Cottet</u>, <u>Beverly A. Farrell</u>); <u>Yelena Slepak</u>, Senior Trial Attorney, Office of the Assistant Chief Counsel for International Trade Litigation, U.S. Customs and Border Protection, of counsel, for Defendant.

July 26, 2011

### Opinion & Order

Carman, Judge: This action is before the Court on more motions for summary judgment—the sixth and seventh such motions filed in this case.  Plaintiff brought this case disputing the classification of its imported merchandise, engineered hardwood

flooring, under tariff subheadings for plywood.  Plaintiff has two remaining claims by

which it seeks reclassification.  In the "fifth cause of action," Plaintiff asserts a

"commercial designation" claim, alleging that the term plywood has a meaning in the

wholesale plywood trade that is different than its common meaning, and that the

commercial designation excludes engineered hardwood flooring.  In the recently added

"eighth cause of action," Plaintiff alternatively asserts that its goods do not fall within

the common meaning of the term plywood.  For the reasons set forth below, the Court

finds that there is no genuine issue of any material fact with respect to these two claims,

and that Defendant is entitled to judgment as a matter of law on both.  Judgment will

enter accordingly.[1]

## PROCEDURAL AND FACTUAL BACKGROUND

This case has been aggressively litigated.  The court has previously issued three

opinions totaling 135 pages, in the process of resolving multiple procedural and

substantive motions.  Familiarity with these previous opinions[2] is assumed.  While the

issues remaining in this case have diminished greatly, the amount of paper dedicated to

---

[1]Plaintiff also requested the opportunity to make an "oral presentation" pursuant to USCIT R. 7(c) and 56(c).  (Pl.'s Mot. for Summ. Adjudication on the Eighth Cause of Action in the Compl. ("Pl.'s Mot.") 6.)  The court treats this request as a request for oral argument, finds that oral argument is not warranted, and denies Plaintiff's request.

[2]Kahrs Int'l. Inc. v. United States, 33 CIT __, 602 F. Supp. 2d 1352 (2009) ("*Kahrs I*"), Kahrs Int'l. Inc. v. United States, 33 CIT __, 2009 WL 2985942 ("*Kahrs II*"), and Kahrs Int'l. Inc. v. United States, 33 CIT __, 645 F. Supp. 2d 1251 (2009) ("*Kahrs III*").

arguing over them has increased exponentially.  In particular, Plaintiff filed over 2,600

pages of exhibits in support of its motion for summary judgment on the eighth cause of

action, and in opposition to Defendant's motion for summary judgment on the fifth and

eighth causes of action.  (See Docket Nos. 178–187, 200–238, and 241.)

    At issue in this case is the classification of three types of engineered hardwood

flooring imported by Plaintiff: 14mm, 2-strip 15mm, and 3-strip 15mm.[3]  (Mem. of Law

in Supp. of Def.'s Mot. for Summ. J. on the Fifth and Eighth Causes of Action in the

Compl. ("Def.'s Mot.") 1; Pl.'s Mot. for Summ. Adjudication on the Eighth Cause of

Action in the Compl. ("Pl.'s Mot.") I-2.)  U.S. Customs and Border Protection ("CBP" or

"Customs") classified Plaintiff's merchandise under HTSUS Subheading 4412.14.31 and

4412.29.36, eo nomine provisions for plywood, at a duty rate of 8% ad valorem.  (Def.'s

Mot. 1; Pl.'s Mot. II-1.)  Kahrs asserts that its merchandise is appropriately classified

under HTSUS Subheading 4412.29.56, a basket provision encompassing "veneered

panels and similar laminated wood," free of duty.  (Pl.'s Mot. II-1.)

    In Kahrs III, the Court held that Plaintiff's 14mm and 15mm flooring fell within

_____

[3]Plaintiff asserts that the classification of its 7mm and 11mm flooring is also in
dispute, but the United States has conceded that these products are "classifiable in
HTSUS Heading 4412, subheading 4412.29.56, the provision for 'other' plywood,
veneered panels and similar laminated wood, free of duty."  (Def.'s Resp. 3.)  Seeing no
dispute as to the classification of this merchandise, the Court focuses on the arguments
made with respect to the 14mm and 15mm flooring.

the common meaning of the term plywood, and was therefore appropriately classified

under the government's preferred tariff subheading.  *Kahrs III*, 645 F. Supp. 2d. at

1277-78 (citing Boen Hardwood Flooring, Inc. v. United States, 357 F.3d 1262 (Fed. Cir.

2004) ("*Boen*")).  In so doing, the Court relied upon the definition of the term plywood

as set out in Webster's Third New International Dictionary, the Explanatory Notes to

heading 4412, and *Boen*.  Id. at 1277.

Following *Kahrs III*, Plaintiff was left with one remaining claim that, if successful,

could result in its preferred classification: the commercial designation claim set out in

the fifth cause of action.  (Compl. ¶¶ 48-62.)  In this claim, Plaintiff alleges that at the

time the HTSUS was enacted into law in 1988, there was a commercial designation for

the term plywood that differed from the common meaning of plywood, that was

general, definite, and uniform throughout the United States at that time, and that did

not encompass plaintiff's engineered hardwood flooring.  (Id.)  Any commercial

designation claim, including this one, rests on the theory that "the trade designation

[was] so universal and well understood that the Congress, and all the trade, are

supposed to have been fully acquainted with the practice at the time the law was

enacted."  Timber Products Co. v. United States, 515 F.3d 1213 (Fed. Cir. 2008) (quoting

Jas. Akeroyd & Co. v. United States, 15 Ct. Cust. 440, 443 (1928)); see also Compl. ¶ 51

("Congress intended to incorporate the commercial meaning of the term 'plywood' in

Heading 4412.").

Once *Kahrs III* was issued, this case appeared headed for trial on Plaintiff's

commercial designation claim.  (<u>See</u> Docket No. 120 (scheduling order permitting

Plaintiff to withdraw its previously filed motion for summary judgment on the fifth

cause of action, permitting additional discovery, and setting dates for the submission of

a pretrial order, and for trial).)  The Court received what amounted to a proposed

pretrial order in a series of filings made throughout July and August, 2010.  (Docket

Nos. 128–129, 132–135, 138–143.)  As the Court was reviewing these myriad

submissions, on October 11, 2010, Plaintiff sought leave of the Court to amend its

Complaint to assert a claim that its goods were not properly classifiable under any

HTSUS subheading for plywood, because the common meaning of that term does not

encompass Plaintiff's product.  (Docket No. 147.)

Initially, the Court was disinclined to grant Plaintiff's motion to amend its

complaint.  Not only was the motion made at an unusually late stage of the proceeding,

but it appeared that the motion might have been deniable on grounds of futility.  The

meaning of a term in an HTSUS heading or subheading is a pure question of law.

<u>Medline Industries Inc. v. United States</u>, 62 F.3d 1407, 1409 (Fed. Cir. 1995).  In this

instance, the common meaning of the term plywood had been conclusively and

unambiguously established by the Court of Appeals for the Federal Circuit ("CAFC") in

*Boen*. *Boen*, 357 F.3d at 1265.  The definition of plywood for purposes of tariff

classification is thus binding precedent on this Court, and, one might think, not subject

to revision by this court.

Moreover, the question of fact—whether the imported items fall within the scope

of a specific tariff subheading—had already been resolved by the Court in this case.  See

Medline Indus., 62 F.3d at 1409 (explaining that where in the HTSUS item is classified is

a question of fact); *Kahrs III*, 645 F. Supp. 2d at 1277-78 (deciding the question of fact in

this case).  Because Plaintiff has not alleged changed facts, the only basis for the Court to

change its determination that Plaintiff's merchandise is classifiable as plywood would

be if the legal determination in *Boen* as to the common meaning of the term plywood

was incorrect.  As explained above, this appeared to be a tough row to hoe.

Ultimately, however, the Court granted Plaintiff's motion to amend its complaint

out of an abundance of caution.  In doing so, the Court found instructive a series of

cases under the name Schott Optical Glass, Inc. v. United States, which bore many

similarities to the matter at hand.  See Schott Optical Glass, Inc. v. United States, 7 CIT

36, 587 F. Supp. 69 (1984) ("*Schott II*"), rev'd 750 F.2d 62 (Fed. Cir. 1984) ("*Schott III*").  In

*Schott II*, the plaintiff had filed suit in the Court of International Trade ("CIT") to

dispute the classification of its goods under a tariff subheading for "other optical glass,"

claiming that its goods did not fall within the common meaning of the term "optical

glass." *Schott II*, 587 F. Supp. at 69-70.  In that case, as here, there was a preceding

opinion from the Court of Appeals construing the common meaning of the relevant

term in the tariff subheading—in that case, "optical glass."  See Schott Optical Glass Inc.

v. United States, 612 F.2d 1283 (CCPA 1979) ("*Schott I*").  The CIT concluded in *Schott II*

that the CAFC had decisively resolved the legal question of the common meaning of

"optical glass" in *Schott I,* and determined that *stare decisis* precluded the CIT from

reaching a different conclusion about the common meaning of the term.  *Schott II*, 587 F.

Supp. at 70-71.  Applying that apparently straightforward precedent, the CIT entered

judgment for Defendant.  Id. at 73.

        In *Schott III*, the CAFC reversed the judgment of this court, citing "a well-

recognized exception to *stare decisis*" requiring that "[a] court will reexamine and

overrule a prior decision that was clearly erroneous."  *Schott III*, 750 F.2d at 64 (citing

cases).  The CAFC faulted this court for refusing to permit the plaintiff to introduce

evidence that might have shown that the interpretation of the common meaning of

"optical glass" established by the Court of Appeals in *Schott I* had been clearly

erroneous.  Id.  The CAFC found that by refusing to consider such evidence, this court

had improperly borrowed from the doctrine of *res judicata*,[4] which is inapplicable in

customs classification cases.  Id. (citing United States v. Stone & Downer Co., 274 U.S.

225 (1927) ("in customs classification cases a determination of fact or law with respect to

one importation is not *res judicata* as to another importation of the same merchandise by

the same parties.").)  Therefore, the holding of *Schott III* instructs that when the CAFC

has ruled on a question of law, such as the common meaning of a tariff term, although

such a ruling may constitute binding precedent and may serve as the basis for *stare*

*decisis*, this court errs when it prevents a party from attempting to show that the ruling

of the CAFC is clearly erroneous.  Id. at 65 ("The Court of International Trade has not

given any convincing explanation why Schott should be denied the opportunity to

introduce additional evidence that it believes will establish that [*Schott I*] was clearly

erroneous.").

In light of the *Schott* cases, the Court decided to grant Plaintiff's motion to amend

its complaint.  (Order of December 8, 2010 (Dkt. 158), accepting Plaintiff's (Proposed)

Amendment to Complaint as docketed on December 2, 2010 ("*8th COA*") (Dkt. 157).)

Plaintiff explicitly represented to the Court that it sought to amend its complaint in

order to introduce testimony of certain expert witnesses that it hoped would

---

[4]*Res judicata* "bars litigation by the same parties of the same issues previously adjudicated."  *Schott III*, 750 F. 2d at 64.

"conclusively establish that the definition of plywood arrived at in [*Boen*] was

erroneous."  (<u>Letter to the Court Requesting Permission to File a Motion for Leave to

Amend its Complaint</u> at 5, Docket No. 147.)  Consequently, despite the fact that *Boen* is

binding precedent that has resolved the salient legal question of the common meaning

of plywood for purposes of tariff classification, and notwithstanding that this Court has

already ruled as a matter of fact that Plaintiff's merchandise falls within that common

meaning of plywood, this Court concluded that justice required Plaintiff be given an

opportunity to demonstrate that these decisions were clearly erroneous.  <u>See</u> *Schott III*,

750 F.2d at 65.

Following a brief period of additional discovery, Plaintiff moved for summary

judgment on the eighth cause of action, and defendant moved for summary judgment

on the eighth and fifth causes of action.

## JURISDICTION & STANDARD OF REVIEW

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(a).

Summary judgment is appropriate when "there is no genuine issue as to any material

fact" and the Court determines that the movant is "entitled to judgment as a matter of

law."  USCIT R. 56(c).  The CIT reviews CBP protest denials "upon the basis of the

record made before the court," which is to say, *de novo*.  28 U.S.C. § 2640(a)(1); <u>see also

Park B. Smith, Ltd. v. United States</u>, 347 F.3d 922, 924 (Fed. Cir. 2003).

DISCUSSION

## I.    Eighth Cause of Action – Common Meaning

In the eighth cause of action, Plaintiff aims to establish what the common meaning of the term plywood is, and to demonstrate that this definition does not encompass its product.  However, because the CAFC already established the common meaning of plywood in *Boen*, the only way for Plaintiff to prevail on this cause of action is to prove, as per *Schott III*, that the *Boen* definition is clearly erroneous, and that this Court therefore should not be bound by *stare decisis*.  There is no dispute between the parties as to the nature of Plaintiff's merchandise, only as to the meaning of the term plywood for purposes of tariff classification.  Accordingly, on the eighth cause of action, there is no genuine issue as to any material fact, and this claim is ripe for summary judgment.

In order to evaluate whether Plaintiff has succeeded in this endeavor, the Court will first review the sources upon which the CAFC and this Court previously relied in establishing the common meaning of plywood.  Then, the court will consider the arguments Plaintiff makes to change that definition, the sources it relies upon to justify doing so, and the arguments Defendant makes in response.  Finally, the Court will assess whether Plaintiff has shown that the earlier decisions were clearly erroneous.

### A.      The Common Meaning of Plywood Established In *Boen*

The term plywood is not defined in the HTSUS, and as such should be given its

common meaning.  See *Boen*, 357 F.3d at 1264; *Kahrs III*, 645 F. Supp. 2d at 1277.  In

*Boen*, the court primarily relied upon the definition of plywood found in two industry

publications, the "Voluntary Product Standards PS 1-95" ("VPS") and "Terms of the

Trade," as well as the definition in Merriam Webster's Collegiate Dictionary.  *Boen*, 357

F.3d at 1264–65.  The court concluded that

> [t]here are three common characteristics of "plywood" found in the
> definitions provided [in these sources]: (1) there must be at least three layers;
> (2) each layer must be arranged at a right angle to its adjacent layer; and (3)
> the layers must be bonded together.

Id. at 1265.  The court considered arguments regarding whether each layer in a piece of

plywood needs to be comprised of a continuous expanse.  Upon further consultation

with the VPS, the court rejected that notion.  The CAFC concluded that the definition of

plywood "encompasses a product whose middle layer is composed of slats or strips

with minor spacing between them."  Id.

In *Kahrs III*, this court relied upon the definition of plywood as determined in

*Boen*.  Additionally, the Court consulted the definition of plywood in Webster's Third

New International Dictionary and Explanatory Note 44.12, and contrasted these

definitions with the meaning of "engineered flooring" according to the National Wood

Flooring Association.  *Kahrs III*, 645 F. Supp. 2d at 1277.  These sources confirm the

tripartite definition arrived at in *Boen*—plywood is comprised of at least three layers,

the grain of each layer arranged at right angles to the adjacent layers, and glued,

cemented, or otherwise bonded together.  See generally, id.  On the basis of the

definition of plywood compiled from the aforementioned sources, the Court concluded

that engineered flooring of the type imported by Plaintiff was properly classifiable

under the HTSUS subheading for plywood.  Id.

### B.      Plaintiff's Arguments – 8th Cause of Action

In support of the eighth cause of action, Plaintiff levels two main arguments

aimed at dislodging the common meaning of plywood established in *Boen* and *Kahrs III*,

First, Plaintiff contends that a product cannot be considered plywood unless it is

manufactured with "balanced construction."  Second, Plaintiff attempts to revive an

argument explicitly considered and rejected by the court in *Boen*: that a product cannot

be plywood when the core layer is not a continuous expanse.  Plaintiff also advances an

argument that even if its product was once plywood, it has been further manufactured

and substantially transformed into a product with a different name, character and use.

To justify all of these contentions, Plaintiff would have the Court rely primarily on the

sworn declarations of several expert witnesses.

1.      <u>Whether Balanced Construction is a Requirement of Plywood</u>

First, Plaintiff asserts that the common meaning of the term plywood includes a

requirement that the product be manufactured with a "balanced construction," which it

claims to mean "that the corresponding layers on each side of the core must be made of

the same thickness and be made of the same category of wood species."  (Pl.'s Mot.

VI-2.)  Plaintiff asserts that neither its 14mm nor 15mm flooring has balanced

construction, and therefore it cannot fall within the common meaning of the term

plywood.  (<u>Id.</u>)  In support of this contention, Plaintiff offers the sworn declarations of

six expert witnesses.  (<u>Id.</u>)

Plaintiff's experts attempt to justify their opinions about balanced construction

through citation to various textual sources.  Experts Long and Forholt each cite two

publications from the U.S. International Trade Commission: the <u>Summary of Trade and</u>

<u>Tariff Information on Softwood Veneer and Plywood</u>, USITC Pub. 841 (Feb. 1981) and

the <u>Summary of Tariff and Trade Information on Hardwood Plywood</u>, USITC Pub. 841

(Apr. 1978) (the "USITC Publications").  (Pl.'s Annexation of Concise Stmt. of Relevant

Facts as to Which There Is No Genuine Dispute[5] ("CSF") ¶¶ 5, 6.)  These publications

describe softwood and hardwood plywood as having "balanced construction," which is

parenthetically described as "**an equal number of comparable plies on both sides of a**

_____

[5] By citing to Plaintiff's statement of facts as "CSF" the Court does not endorse
Plaintiff's characterization of its statement as either concise or undisputed.

**central ply**." (Forholt Decl. ¶¶ 22, 23 (emphasis added).)  Experts Long, Holt and

Kreamer all quote from a book by John G. Shea, entitled <u>Plywood Working for</u>

<u>Everybody</u>, which states: "[b]ecause of the balanced construction of plywood—**with the**

**grain of one ply bonding and crossing the grain of another**—it has much less tendency

to warp than solid wood."  (CSF ¶ 7; Long Decl. ¶ 30 (emphasis added).)  Expert Long

also notes that the primary industry standard for hardwood plywood, despite not

including the term "balanced construction" in its glossary, does state in Section 3.10 that

"[a]ll plies shall be **combinations of species, thickness, and moisture content to**

**produce a balanced panel**."  (CSF ¶ 8; Long Decl. ¶ 35 (emphasis added).)  These

appear to be the only textual sources that any of Plaintiff's expert witnesses cite in

support of the concept that balanced construction is a requirement for plywood.  (Pl.'s

Mot. VI-1 – VI-3.)

        Plaintiff's experts also cite copious sources that contradict their opinions that

balanced construction is a requirement for plywood.  All six of Plaintiff's experts

reference the definitions of hardwood plywood included in the 1983 and 2004 versions

of the voluntary standards established by the Hardwood Plywood and Veneer

Association and the American National Standards Institute ("HPVA/ANSI").  (<u>See</u>, <u>e.g.</u>,

Long Decl. ¶¶ 26–27.)  These definitions make no mention of balanced construction.

Similarly, five of Plaintiff's experts cite the definitions of softwood plywood from the

1983 and 1995 industry standards produced by the American Plywood Association

("APA").  These definitions are similarly silent on the issue of balanced construction.

(See, e.g., id. ¶¶ 24–25.)  Because none of these textual sources invoke balanced

construction in their definitions, each expert takes the remarkable position that the

industry standard definitions of hardwood and softwood plywood are deficient.

(See e.g., id. ¶ 28 ("these separate definitions . . . are reasonably complete except for one

important aspect . . . that plywood must be made of 'balanced construction.'")

     Moreover, all six experts cite

- the definition of plywood found in Webster's Third International Dictionary,
- the definition of plywood established by the CAFC in Timber Products Co. v. United States, 515 F.3d 1213 (Fed. Cir. 2008),
- the description of plywood found in the Explanatory Note to Heading 4412,
- the definition of plywood found in Terms of the Trade, Random Lengths Publications, Fourth Edition (2000), and
- the definitions of plywood found in the 1987 and 2000 publications of Wood Handbook, published by the Forest Products Laboratory, USDA.

A plurality of Plaintiff's experts cite the definition of plywood found in McGraw-Hill

Dictionary of Technical Terms, and more than one expert explicitly tackles the definition

of plywood established by the CAFC in Boen, as well as the definition of plywood found

in Plywood Working for Everybody, Van Nostrand Reinhold Company (1981).  This

diverse and exhaustive list of nine further textual sources defining or describing

plywood share two things in common: they are uniformly silent on the alleged

requirement that plywood have balanced construction, and they are uniformly

criticized or dismissed by Plaintiff's experts for that reason.

In sum, while Plaintiff's experts were able to identify four textual sources making

some reference to "balanced construction" or the "balanced" nature of a panel of

plywood, they also collectively identified 13 textual sources that contradict their

opinions.

2.    <u>Whether the Core Layer of Plywood May Contain Gaps</u>

Plaintiff alleges further error in the common meaning of plywood established in

*Boen*, claiming that a product with engineered gaps in its core cannot be plywood.

Specifically, Plaintiff asserts that its 15mm flooring does not qualify as either "lumber

core" or "veneer" plywood, because the "gaps that are designed, engineered, and built

into the core," do not meet the requirements of any standard commonly used in the U.S.

plywood industry since September 7, 1995, precluding it from being plywood.[6]  (*8th*

*COA* ¶¶ 7–9.)  Also, on account of this design feature, Plaintiff claims its 15mm flooring

is not bought and sold as plywood, and is not recognized as lumber core plywood by

"[t]hose experienced in the buying and selling of plywood in the plywood trade."  (*8th*

---

[6]The middle layer of Plaintiff's 14mm flooring is not comprised of slats, so
Plaintiff does not make this argument with respect to that product.

*COA* ¶ 6.)  In support of this argument, Plaintiff would once again have the Court rely

on the sworn declarations of its expert witnesses.  (Pl.'s Mot. VI-3 – VI-5.)

        For these contentions, Plaintiff cites no new source, but rather argues that the

CAFC misinterpreted Section 5.8.1 of Voluntary Product Standard 1-95, which permits

gaps in the crossbands of plywood.  (Id. at VI-3.)  The standard reads, in relevant part:

> Crossband gaps or center gaps, except as noted for plugged crossband and
> jointed crossband, shall not exceed 25 mm (1 inch) in width for a depth of 205
> mm (8 inches) measured from panel edge.

Voluntary Product Standard PS 1-95: Construction and Industrial Plywood § 5.8.1 (See

Ex. 10 to Pl.'s Resp., Forholt Decl., Attach. G).  While the standard states a specific

distance limiting the depth of any crossband or center gaps (8 inches), Plaintiff reasons

that because 8 inches is about 16% of the total width of a 4' by 8' panel of plywood, what

this standard really **means** is that any gap in the core of a piece of plywood is limited to

16% of the width of that piece of plywood.  (Id. at VI-4.)  Plaintiff experts Griede, Holt

and Forholt all agree that this standard does not permit gaps to run across the full

width of a piece of plywood, as the gaps do in Plaintiff's 15mm flooring, but cite no

textual authority in support of their opinions.  (CSF ¶ 27.)

        Additionally, Plaintiff argues that the gaps in its 15mm flooring do not satisfy the

requirements of Section 5.8.1. on the basis of their length alone.  (Pl.'s Mot. VI-4.)

Plaintiff asserts that while the standard permits gaps of up to 8 inches, "[t]he length of

those gaps in the 15mm flooring extends to 9 inches, including the edgework." (Id.)

3.      Whether Plaintiff's Product Was Substantially Transformed

Plaintiff also contends, directly and simply, that its product does not fall within

the *eo nomine* provision for plywood.  Plaintiff argues that even if its product "ever

remotely were plywood," it has "advanced beyond plywood" and has been

"substantially transformed" into a new and different product.  (Id. at VI-5.)  Plaintiff

describes the manufacturing process by which its goods are produced, which involves

cutting layers of wood for the face, bottom and core,[7] gluing and laminating these layers

together under heat and pressure, trimming, sanding, finishing, and cutting edgework.[8]

(Id. at VI-7.)  Plaintiff does not identify at which step in this process its product may

have been plywood, but suggests that the step of cutting edgework is the step that

might have effected substantial transformation.  (Id. ("The unique edging of Kahrs

flooring indicates that it is not intended to be fungible . . . .").)  This argument rests on

Plaintiff's insistence that its product is only bought, sold and marketed as flooring, and

never as plywood.  (Id. at VI-8–9.)

_____

[7]The 15mm flooring has a core made of "fingers," also known as slats; the 14mm
flooring has a core made of a "5-ply poplar panel."  (Pl.'s Mot. VI-7.)

[8]The 15mm flooring utilizes a "patented Woodloc™" mechanism, whereas the
14mm flooring has "tongue and grooving edgework."  (Id. at VI-7.)

### C.     Defendant's Arguments

Defendant responds to Plaintiff's arguments both by criticizing the sources

Plaintiff relies upon to support its claim, and by disputing Plaintiff's claim on the merits.

　　　　1.     <u>Whether Plaintiff May Use Expert Witness Declarations in Support of the 8th Cause of Action</u>

First, Defendant contends that Plaintiff should be prohibited from using expert

declarations to prove the common meaning of plywood, because (1) the experts were

not properly disclosed during the period of additional discovery that was provided for

the eighth cause of action, and (2) opinion testimony is an impermissible basis for

resolving a question of law, such as the meaning of a tariff term.  (Def.'s Resp. 4–10.)

Even if the Court considers the expert declarations, however, Defendant maintains that

Plaintiff's 14mm and 15mm flooring falls within the common meaning of the term

plywood.  (<u>Id.</u> 11–28; Def.'s Mot. 8–20.)  Finally, Defendant argues that the position

taken by CBP that Plaintiff's flooring is plywood is entitled to <u>Skidmore</u> deference.

(Def.'s Mot. at 5–8.)

　　　　　　*a.     Whether Plaintiff Committed a Discovery Violation*

In regards to the alleged discovery violation, Defendant points out that the

scheduling order that permitted limited discovery on the eighth cause of action

required the parties to make expert disclosures by January 28, 2011 and to identify all

witnesses each party intended to depose by February 2, 2011.  (Def.'s Resp. 4.)

Defendant also points to USCIT Rule 26(a)(2), which requires the disclosure of a person

who may be used at trial to present opinion testimony.  (<u>Id.</u>)  Defendant alleges that

Plaintiff did not comply with the requirements of the scheduling order or USCIT R.

26(a)(2) because no expert witness reports related to the eighth cause of action were

produced until the end of discovery, between February 25, 2011 and March 22, 2011.

(<u>Id.</u> at 5.)  Defendant claims it could not conduct depositions of Plaintiff's experts until it

received these declarations, but once it had received them, the time allotted for

discovery had elapsed.  (<u>Id.</u> at 6.)  To remedy this violation, Defendant requests that the

Court refuse to consider Plaintiff's expert witness reports insofar as they apply to the

eighth cause of action.  (<u>Id.</u> at 6–7.)

        Plaintiff responds to this alleged discovery violation by explaining that the

court's scheduling order only required the parties to disclose experts that had "not been

previously identified in this case," and that because all of Plaintiff's witnesses were

previously disclosed in regards to the fifth cause of action, no discovery violation

occurred.  (Pl.'s Rep. to Def.'s Resp. to Pl.'s Mot. for Summ. J. on the Eighth Cause of

Action ("Pl.'s Rep.") 2–3, 6–7.)

                    b.        *Whether Testimony is Properly Considered When Resolving a*
                              *Question of Law*

        Defendant also seeks the exclusion of Plaintiff's expert witness reports on the

grounds that opinion testimony is an inappropriate basis for resolving a pure question

of law, such as the common meaning of a term in an HTSUS heading or subheading.

(Def.'s Resp. 7–10.)  Defendant cites the general proposition that "[e]xperts are

prohibited from opining on the law or its application in a particular scenario," and

points out that expert witness testimony necessarily relates to fact questions, of which

there should be none, if the case is to be resolved by summary judgment.  (Id. at 7

(citing cases).)  Defendant acknowledges that the CIT and its predecessor (the Customs

Court) have occasionally considered expert testimony to establish the common meaning

of a tariff term, but have done so only under limited circumstances not present here.

(Id. at 8–9 (citing Toyota Motor Sales, U.S.A., Inc. v. United States, 7 CIT 178, 182, 585 F.

Supp. 649, 653 (1984) (relying on lexicographic sources to construe tariff term and

finding that the testimony regarding industry usage of a term in issue may serve as an

aid, but is not binding), aff'd based on opinion below, 753 F.2d 1061 (Fed. Cir. 1985); and

Tropical Craft Corp. v. United States, 45 CCPA 59, 61, C.A.D. 673 (1958) (testimony as to

common meaning advisory only, and insufficient to overcome contrary dictionary

definitions).)

     Plaintiff responds to this argument by citing instances in which courts have

considered affidavits containing expert opinion testimony when granting summary

judgment, and by arguing that rather than opining on the meaning of a tariff term, its

experts merely seek to provide their opinions on the meaning of terms within their

professional experience.  (Pl.'s Rep. 4–7.)

>       2.      Defendant's Contentions on the Merits of the 8th Cause of Action

 Defendant also asserts that even if Plaintiff is permitted to use expert witness

reports to support the eighth cause of action, Plaintiff's 14mm and 15mm flooring is

nonetheless properly classifiable as plywood, within the common meaning of that term.

(Def.'s Resp. 10–28; Def.'s Mot. 8–20.)  Defendant cites *Kahrs III*, *Boen*, and no fewer than

ten textual sources, each of which provides a definition of plywood consonant with the

definition established by the courts in these cases.  (Id.)  Defendant notes that the CAFC

considered and rejected the argument that gaps in the center layers of a sheet of

plywood prevent an otherwise qualifying product from constituting plywood.  (Def.'s

Resp. at 16–18.)  Defendant points out that while the HTSUS includes certain

requirements for the plywood classifiable under the subheadings in question (such as

having no ply thicker than 6mm, and having at least one outer ply of nonconiferous

wood), there is no requirement in the HTSUS that plywood have "balanced

construction," as that term has been defined by Plaintiff.  (Id. at 19.)  Moreover,

Defendant was unable to locate a single definition of plywood that requires it to be of a

"balanced construction," and the only located sources which utilize the term "balanced"

to describe plywood appear to do so in reference to characteristics present in Plaintiff's

flooring.  (Id. at 19–21.)

Defendant's last argument with respect to the eighth cause of action is that CBP has taken a position that engineered wood flooring such as Plaintiff's is properly classifiable as plywood, and that this determination "is entitled to deference or some high measure of respect from the Court."  (Def.'s Mot. 5 (citing United States v. Mead Corp., 533 U.S. 218, 234 (2001) (finding that CBP classification rulings are entitled to deference as established by Skidmore v. Swift & Co., 323 U.S. 134 (1944).)  Defendant refers to multiple ruling letters which set out this position, and notes that the CAFC in *Boen* affirmed this very position.  (Id. at 7.)  Plaintiff responds by trying to make the case that Skidmore deference should not be given to a CBP classification ruling when the Court is deciding a question of law.  (Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. on the Fifth and Eighth Causes of Action ("Pl.'s Resp.") 5–8.)  In turn, Defendant notes that the Supreme Court has held that "deference is not inconsistent with *de novo* review or with this Court's obligation to reach the correct" result, as described in Jarvis Clark v. United States, 733 F.2d 873 (Fed. Cir. 1984).  (Rep. to Pl.'s Opp. to Def.'s Mot. for Summ. J. on the Fifth and Eighth Causes of Action ("Pl.'s Rep.") 7 (citing United States v. Haggar Apparel Co., 526 U.S. 380 (1999)).)

D.    **Analysis**

1.    Plaintiff May Use Expert Witness Declarations

The Court will not prohibit the use of Plaintiff's expert witness declarations in

support of the eighth cause of action.  First, Defendant has not persuaded the Court that

there was a discovery violation in regards to expert disclosure.  The Court's scheduling

order of December 22, 2010 states in relevant part:

> [i]f an expert witness, **who has not been previously identified
> in this case**, is designated for use at trial regarding the Eighth
> Cause of Action, disclosure shall be made in accordance with
> USCIT Rule 26(a)(2) as soon as practicable, and no later than
> Friday, January 28, 2011.

(Dkt. 169 (emphasis added).)  Because all of Plaintiff's expert witnesses had been

previously identified in this case, the obligation imposed by this paragraph was never

triggered, and USCIT R. 26(a)(2) (which requires disclosure of witnesses) was not

violated.  While it might have been helpful for Defendant to depose Plaintiff's experts

for a second time, in order to plumb their testimony about the common meaning of

plywood, the Court is not persuaded that Defendant was prevented from doing so—at

least by any overt action of Plaintiff.  Moreover, Defendant acknowledges that "the

substantive portions of the testimony of Kahrs' 'experts,' . . . were initially offered in

support of Kahrs' motion for summary judgment on the fifth cause of action."  (Def.'s

Rep. 5.)  As such, Defendant cannot claim that it was blind-sided by any argument

Plaintiff now makes regarding the eighth cause of action.  Even if Plaintiff was less than

forthcoming during the most recent period of discovery, it is clear to the Court, upon

careful consideration of the substance of Plaintiff's expert witness declarations, that

Defendant will not be prejudiced by their admission.

Defendant also has not persuaded the Court that it is improper to consider the opinions of expert witnesses when establishing the common meaning of a tariff term. To the contrary, for nearly a century, the courts have permitted the use of testimony to establish common meaning, but have uniformly held that any such testimony should be subordinate to reliable textual sources. United States v. Crosse & Blackwell, Inc., 22 C.C.P.A. 214, 217–18, T.D. 47,141 (1934) ("While the opinions of witnesses as to the common meaning . . . [are] proper to be considered . . . the usual rule is to consult standard lexicographers to determine the common meaning of statutory words."); United States v. May Department Stores Co., 16 Ct. Cust. Appls. 353, 355–56, T.D. 43,090 (1927) ("[I]n determining the common meaning of a term, testimony is only advisory and has no binding effect upon the court, since the common meaning of a term is ordinarily within the cognizance of the court, and the court may further obtain knowledge of the common meaning of a term from the dictionaries, lexicons [or] written authorities . . . .").[9]  Accordingly, the Court will treat the opinions of Plaintiff's expert witnesses pertaining to the common meaning of plywood as advisory and non-binding, and will credit such testimony only to the extent that it is supported, and not

_____

[9]The court in May Department Stores saw this conclusion as so axiomatic that "it requires no citation of authority."  16 U.S. Cust. App. at 355.  Unfortunately, this Court has no such luxury.

contradicted, by reliable textual sources.[10]  See Toyota Motor Sales, 585 F. Supp. at 654

(permitting testimony on common meaning, but noting that such testimony may only

serve as an aid, and is not binding); United States v. John B. Stetson Co., 21 C.C.P.A. 3, 9

(1933) (same); see also United States v. Tropical Craft Corp., 42 C.C.P.A. 223, 223–28

(1955) (holding that the Customs Court should have discounted testimony on common

meaning that was contrary to the definitions provided in authoritative sources).

> 2.   Plaintiff Has Failed To Demonstrate that the Definition of Plywood
>       Established in *Boen* Was Clearly Erroneous

After carefully considering the arguments and textual sources cited by the

parties, along with the opinions espoused in Plaintiff's expert witness declarations, the

Court concludes that there is no genuine issue as to any material fact on the eighth

cause of action, and Defendant is entitled to judgment as a matter of law.

For the reasons described previously, supra at 6–9, the only scenario under

which this Court would disturb its prior ruling would be if Plaintiff demonstrated that

the common meaning of plywood arrived at in *Boen* was clearly erroneous.[11]  See *Schott*

---

[10] "Suppose the question before the court was, is a horse an animal, and the proof would show that a horse was not an animal. It is doubtful if the testimony in this kind of supposed case would be regarded by any court as any evidence at all. But, certainly . . . [such testimony] would not control as against the judicially known fact and judicially decided fact, that a horse is an animal."  United States v. Flory & Co., 15 Ct. Cust. Appls. 156, 160, T.D. 42,219, 1927 WL 29495 at *4 (1927).

[11] The Court's obligation to follow binding precedent is stronger than any Skidmore deference the Court might extend to CBP classification rulings.  Accordingly,

*III*, 750 F.2d at 64–65; <u>see</u> <u>also</u> 20 Am. Jur. 2d <u>Courts</u> § 132 (offering a survey of cases

enunciating the grounds for deviating from precedent).  Not only has Plaintiff failed to

do so, the Court finds that Plaintiff has not even been able to articulate a viable

alternative definition for plywood.  To the contrary, the testimony of Plaintiff's expert

witnesses is so extensively and uniformly contradicted by the very textual sources **they**

**cite**, as well as those relied on in *Boen* and *Kahrs III*, that the Court finds Plaintiff's

expert witness testimony unpersuasive.

> a.        *Balanced Construction Is Not Part of the Definition of Plywood*

On the issue of balanced construction, Plaintiff has failed to establish precisely

what the phrase "balanced construction" means, and has failed to identify a single

textual **definition** of plywood that explicitly includes "balanced construction" as a

requirement.  The USITC Publications, which describe "balanced construction" in a

manner akin to Plaintiff's suggested meaning of the phrase, though with considerably

less specificity, provide the best support for Plaintiff's arguments on this issue.

However, Plaintiff's assertion that layers on either side of the core of a piece of plywood

"must be made of the same thickness and be made of the same category of wood

species" is only tangentially supported by the USITC Publications, which simply require

---

because of the existence of binding precedent in this case, the Court does not consider
the extent to which <u>Skidmore</u> deference might compel a similar outcome in this case.

that such plies be "comparable."  <u>Compare</u> Pl.'s Mot. VI-2 <u>with</u> USITC Publications (<u>see</u>

<u>supra</u> at 13).  On the other hand, <u>Plywood Working for Everybody</u> suggests that

"balanced construction" refers not to the comparability of plies on either side of the

core, but to the stability created by layering of adjacent plies at right angles—a

characteristic of plywood that is both consistent with the *Boen* definition and descriptive

of Plaintiff's flooring.  Plaintiff's only other textual source, the ANSI/HPMA, is at best

inconclusive about the meaning of the term "balanced construction" and does not

indicate that all plywood must be made with balanced construction.  Taken together,

these sources do not provide sufficient justification for the court to disregard roughly a

dozen textual definitions of plywood that make no mention of "balanced construction,"

and do not demonstrate that the *Boen* definition is clearly erroneous.

Furthermore, the plain language of the HTSUS *eo nomine* provisions for plywood

appear to contemplate plywood in which different veneers have been applied to the

face and backside of the panel.  If a piece of plywood was manufactured with one outer

ply of coniferous wood, and the corresponding ply on the opposite side of the core was

made from nonconiferous wood, such a product would not, by virtue of this feature, fail

to be classifiable within HTSUS 4412 as plywood, even though it fails to fit within

Plaintiff's proffered definition of balanced construction.  (<u>See</u> HTSUS 4412.14 (providing

for plywood containing "at least one outer ply of nonconiferous wood."); <u>see also</u>

HTSUS 4412.13 (providing for plywood containing "at least one outer ply of tropical

wood").)  Accordingly, Plaintiff's argument about balanced construction is unavailing.

> b.     *The Gaps In Plaintiff's 15mm Flooring Do Not Prevent It from Being Plywood*

The Court is similarly unpersuaded by Plaintiff's argument that the common

meaning of the term plywood includes the requirement that each ply be comprised of a

continuous expanse.  This argument was embraced by this court in an earlier stage of

the *Boen* litigation, only to be rejected by the CAFC.  The CIT concluded

> [t]he definitions indicate that "plywood" is composed of thin sheets of wood glued together with the grains of adjacent layers at right angles.  The definitions of "veneer" and "sheet" indicate that the layers forming plywood are "continuous expanses" of material of a constant thickness.

Boen Hardwood Flooring, Inc. v. United States, 27 CIT 40, 254 F. Supp. 2d 1349, 1361

(2003).  As described above, supra at 11, the CAFC refused to accept that the definition

of plywood was as narrow as the CIT had determined:

> None of the definitions of "plywood" . . . are nearly so restrictive.  The [CIT's] interpretation of "plywood," which imports the requirement that each layer be composed of a single, continuous sheet of wood, ignores the reality of the product and defies the accepted commercial meaning of the term.

*Boen*, 357 F.3d at 1265.  Plaintiff has failed to demonstrate that this conclusion of the

CAFC is clearly erroneous, and therefore has failed to provide this Court with any

legitimate grounds to depart from *stare decisis*.

The Court does not accept the theory floated by Plaintiff's expert witnesses that

although VPS Section 5.8.1 provides explicit measurements for the maximum width and

length of crossband gaps, it really intends to restrict the measurements of such gaps as a

percentage of the width of a "typical" piece of plywood.  Such a standard would be easy

enough to craft, and the Court finds it reasonable to infer that the measurements in this

standard have been intentionally specified.  Furthermore, Plaintiff's experts cite to no

new textual definitions of plywood to support the contention that the product must be

comprised only of layers that are each a continuous expanse.  In the absence of such

new or different textual sources, the Court has no basis upon which it could reject the

binding precedent of the CAFC in *Boen*.

        The Court is also unpersuaded by Plaintiff's argument that because the length of

the gaps in Plaintiff's 15mm flooring are "beyond the [8 inch] limitation imposed by

Section 5.8.1 [of the VPS]," Plaintiff's flooring therefore cannot be plywood.  (Pl.'s Mot.

VI-4.)  The longest measurement of the width of Plaintiff's 15mm flooring (i.e., including

all edge work) is eight and five eighths inches.  If this measurement is taken to be the

length of the gaps,[12] Plaintiff's product indeed may not comply with VPS Section 5.8.1.

---

[12] The Court also notes that the "length" of the gaps could also be measured by
the distance such gaps are completely enclosed (*i.e.*, excluding all edge work), seven
inches, or by the width of the surface of the panel, seven and seven eighths inches.
Under either of these measurements, the gaps in Plaintiff's plywood would appear to
conform with VPS Section 5.8.1.  Because the Court finds it has no bearing on the
appropriate classification of Plaintiff's merchandise, the Court need not resolve which
measurement is appropriate for gauging the length of the crossband gaps.

However, even with over-long gaps, the Court finds Plaintiff's product is still perfectly

described by the common meaning of plywood established in *Boen*: it is comprised of at

least three layers of wood that have been bonded together, with each layer arranged at

a right angle to its adjacent layer.  Even if Plaintiff's 15mm flooring is plywood that does

not conform to VPS Section 5.8.1, it is classifiable as plywood nonetheless.

>    *c.      Plaintiff's Substantial Transformation Argument Is Irrelevant*

The Court also regards Plaintiff's third argument in support of the eighth cause

of action—that its products may have once been plywood, but have been substantially

transformed—to be a red herring.  It is well established that goods shall be classified in

the HTSUS "in their condition as imported."  <u>Dell Products LP v. United States</u>, 642 F.3d

1055, 1059 (Fed. Cir. 2011) (<u>citing</u> <u>Mita Copystar Am. v. United States</u>, 21 F.3d 1079, 1082

(Fed. Cir. 1994)).  In this case, there is no dispute as to the condition of Plaintiff's goods

as imported; physical samples have been provided to and examined by the Court.

Consequently, it matters not what previous incarnations these products have been

through, nor what alchemy was performed to bring them to their current state.  The

argument about substantial transformation is irrelevant.

>    3.      <u>CamelBak Products Does Not Affect the Outcome of This Case</u>

On July 8, 2011, Plaintiff filed a letter to bring to the Court's attention a recent

CAFC decision that it claims "set[s] forth very important new guidelines on the

analytical tools to be used for determining the scope of an *eo nomine* provision under

GRI 1." (Letter of July 8, 2011 1 (<u>citing CamelBak Products, LLC v. United States</u>, __

F.3d __, 2011 WL 2410736 (Fed. Cir. 2011) (Dkt. 245).)  Plaintiff claims that <u>CamelBak</u>

requires the Court to consider certain factors that will demonstrate that its merchandise

falls beyond the scope of the *eo nomine* provision for plywood.  (<u>Id.</u> at 2.)  Plaintiff

argues that in the wake of <u>CamelBak</u>, "an *eo nomine* analysis must now incorporate" a

review of the design, use and function of the product in question, as well as how it is

regarded in commerce, and "whether the additional component is a substantial part of

the whole product."  (<u>Id.</u> at 4 (internal quotation omitted).)  Plaintiff claims that the fact

that its product is not sold or used as plywood "take[s] on new significance under

<u>CamelBak</u>."  (<u>Id.</u> at 5.)

        Defendant responds by arguing that CamelBak did not introduce new criteria for

all *eo nomine* classification cases, but simply highlighted factors that have long been

considered by the courts.  (Government's Response to Plaintiff's July 8, 2011 Letter 1.)

Defendant also distinguishes <u>CamelBak</u> by pointing out that Kahrs' merchandise falls

entirely within the *eo nomine* provision for plywood, whereas the article in <u>CamelBak</u>

was comprised of two components that may have been classifiable under two different

tariff provisions.  Naturally, Plaintiff seized the opportunity to file an additional letter,

in which it insists, among other things, that its 14mm flooring **really is** a composite

article, comprised of a plywood core with front and back veneers.[13]  (Pl.'s Rep. to Def.'s

Resp. to Pl.'s July 8, 2011 Letter 2–3.)

The Court finds that <u>CamelBak</u> does not affect the holding in this case.  The

CAFC stated in <u>CamelBak</u> that, "[i]f the subject articles fall within the scope of [a given]

*eo nomine* . . . provision then, under <u>Mita Copystar</u>, GRI 1 mandates that the subject

articles be classified [under that provision.]" <u>CamelBak</u> at *5.  The "analytical tools or

factors" from <u>CamelBak</u> are only provided to help assess whether a product is "beyond

the reach of the *eo nomine*" provision.  <u>Id.</u>  Plaintiff's merchandise is encompassed

entirely by the definition of plywood.  The Court finds that Plaintiff's merchandise does

not possess an "additional component," alien to plywood, much less "possess features

substantially in excess" of the common meaning of plywood.  <u>CamelBak</u> at *6 (<u>quoting

Casio, Inc. v. United States</u>, 73 F.3d 1095 (Fed. Cir. 1996)).  Accordingly, the

classification question may be resolved without resort to the <u>CamelBak</u> factors, and its

classification will not be disturbed.  <u>See</u> <u>id.</u>

For the foregoing reasons, then, the Court finds that it continues to be bound to

accept the common meaning of plywood set out in *Boen*, just as it was in *Kahrs III*.  The

Court grants summary judgment to Defendant on the eighth cause of action.

---

[13] In its second letter, Plaintiff also requests the opportunity to file additional
briefing on <u>CamelBak</u>, which the Court declines.

## II.     Fifth Cause of Action – Commercial Designation

In the fifth cause of action, Plaintiff aims to prove that at the time the HTSUS was enacted into law in 1988, there was a commercial designation of the term plywood within the plywood wholesale trade, which differed from the common meaning, and was general, definite and uniform throughout the United States.  (Compl. ¶¶ 48–62.) Plaintiff alleges that this commercial meaning does not encompass its engineered hardwood flooring, and seeks a judgment from this Court that its merchandise is instead classifiable as "veneered panels and similar laminated wood," free of duty. (Id. ¶ 62.)  For the reasons set forth below, the Court finds there is no genuine issue of material fact with respect to the fifth cause of action, and Defendant is entitled to judgment as a matter of law.

### A.     Defendant's Contentions

Defendant argues that even if the factual assertions made by Plaintiff's expert witnesses are accepted as true, Plaintiff is unable to prove the uniformity and definiteness prongs of its commercial designation claim as a matter of law.  (Def.'s Mot. 23–26.)  Regardless of what Plaintiff's experts may claim about the commercial designation of plywood that existed in the trade prior to 1988, Defendant points to "publications of industry-wide trade organizations, authoritative publications which are voluntarily utilized and relied upon by the wholesale plywood industry," which

confirm that at that time, the industry regarded plywood according to its common

meaning, rather than any special commercial designation.  (Id. at 23.)  Defendant cites

Timber Products for the proposition that "[c]ontradiction is a sufficient, but not

necessary, condition for finding inconsistency, rather than uniformity throughout the

trade, precluding commercial designation of a tariff term for classification under the

HTSUS."  (Id. at 25–26 (citing Timber Products, 417 F.3d at 1221–22).)

Specifically, Defendant cites the ANSI/HPMA standards for hardwood plywood

from 1983, which defines plywood as

> [a] panel composed of an assembly of layers or plies of veneer (or veneers in
> combination with lumber core, particleboard core, MDF core, hardboard
> core, or of special core material) joined with an adhesive.  Except for special
> constructions, the grain of alternate plies is always approximately at right
> angles, and the face veneer is usually a hardwood species.

(Id. at 23 (quoting ANSI/HPMA HP 1983 at p. 12, § 5, Definitions, PLYWOOD,

HARDWOOD).)  Plaintiff also cites the VPS PS 1-83 Construction and Industrial Plywood

(With Typical APA Trademarks) (December 30, 1983), which defines plywood as

> a flat panel built up of sheets of veneer called plies, united under pressure by
> a bonding agent to create a panel with an adhesive bond between plies as
> strong as or stronger than, the wood.  Plywood is constructed of an odd
> number of layers with grain of adjacent layers perpendicular.  Layers may
> consist of a single ply or two or more plies laminated with parallel grain
> direction oriented parallel to the long dimension of the panel.

(Id. at 24.)[14]  These definitions are consistent with the common meaning of plywood,

now well established by the courts, and serve to rebut Plaintiff's claims that prior to

1988 everyone in the plywood industry, throughout the United States, meant something

different by the term 'plywood.'  See Arthur J. Humphreys, Inc. v. United States, 764

F. Supp. 188, 193 (CIT 1991) (noting that while "[i]ndustrial or commercial standards are

useful in ascertaining the commercial meaning of a tariff term," when the tariff statute

predates the commercial standard, the commercial standard "does not reflect the

congressional understanding of the term [in question] at the time the [tariff statute] was

enacted" and cannot support a claim of commercial designation).

## B.    Plaintiff's Contentions

In its response brief, Plaintiff claims that the commercial designation of plywood

is

> a panel composed of an assembly of layers or plies, typically at right angles
> to each other, all joined together with an adhesive bonded under heat and
> pressure, and the product is typically bought, sold by, manufactured to,
> and/or referenced to, well-recognized plywood veneer grades set forth in
> standards established by industry associations and/or government entities,
> or by standards agreed upon between the parties.

(Pl.'s Resp. 25–26.)  While Plaintiff claims that plywood is **defined** as a product which is

bought and sold according to "well-recognized" veneer grades, Plaintiff acknowledges

---

[14] Defendant cites several other industry publications that provide similar
definitions for plywood, however these are the only textual industry sources from prior
to 1988, the year in which the HTSUS became U.S. law.

that "a buyer might agree with a wholesale seller that he or she would purchase

plywood products that are not bought and sold according to recognized grading

standards," in which case the buyer and/or seller would probably have "internal

standards and an understanding as to the quality of the product that is being sold."  (Id.

at 26.)  Plaintiff acknowledges that VPS PS 1-83, cited by Defendant, was "[t]he plywood

industry standard in effect in 1988," and points out that this standard prescribed "letter

grades . . . to designate the quality of the veneers" used to manufacture the plywood.

(Id.)  Plaintiff rounds out its arguments by insisting that its experts have put forth a

uniform, general and definite rendition of the commercial designation of plywood.  (Id.

at 28–30.)

       **C.**     **Analysis**

           1.     <u>Whether Plaintiff's Fifth Cause of Action States a Claim Upon
Which Relief Can Be Granted</u>

In its complaint, Plaintiff provides little more than a rudimentary description of

the commercial designation that it contends generally, definitely and uniformly existed

throughout the United States in 1988.  The closest Plaintiff comes to actually proffering

a commercial designation is found in paragraph 55, where Plaintiff alleges that plywood

> is bought and sold based on the grades of the face, back, and often the core
> of the plywood sheets.  It is a commodity, component, multipurpose or
> structural material used to make other items.

(Id. ¶ 55.)  While it is not clear whether Plaintiff intended for these sentences to set out

the commercial designation of plywood, it is clear that this excerpt differs significantly

from what Plaintiff now claims is the commercial designation.  (See Pl.'s Resp. 25–26

(claiming the commercial designation of plywood is "a panel composed of an assembly

of layers or plies, typically at right angles to each other, all joined together with an

adhesive bonded under heat and pressure, and the product is typically bought, sold by,

manufactured to, and/or referenced to, well recognized plywood veneer grades").)  In

any event, the Court sees no other portion of Plaintiff's complaint that could be

characterized as setting forth an alleged commercial designation.

　　　　In light of the vagueness of the commercial designation that is set out in the

complaint, the Court has deep reservations about whether Plaintiff has alleged enough

facts in support of the fifth cause of action to state a claim upon which relief can be

granted.  The Supreme Court decided Bell Atlantic Corp. v. Twombly, 550 U.S. 544

(2007), roughly four months before Plaintiff commenced this case; therefore, any motion

to dismiss Plaintiff's complaint pursuant to USCIT R. 12(b)(5)[15] would have been

decided under the Twombly pleading standard.  In relevant part, Twombly held that

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not
> need detailed factual allegations . . . a plaintiff's obligation to provide the
> 'grounds' of his 'entitle[ment] to relief' requires more than labels and
> conclusions, and a formulaic recitation of the elements of a cause of action
> will not do . . . .  Factual allegations must be enough to raise a right to relief

_____

[15] USCIT R. 12(b)(5) is the CIT's equivalent of Fed. R. Civ. P. 12(b)(6), and the
Supreme Court's holding in Twombley applies to it with equal force.

above the speculative level[.]

Twombly, 500 U.S. at 555 (citations omitted).

In light of Plaintiff's failure to set out clearly what the alleged commercial

designation **is**, the Court has some concern about whether Plaintiff's fifth cause of action

constitutes more than a "formulaic recitation of the elements" of a commercial

designation claim, and whether the factual allegations Plaintiff does make "raise a right

to relief above the speculative level."  See id.  However, as Defendant did not move to

dismiss the fifth cause of action for failure to state a claim, and because Defendant's

motion for summary judgment on the fifth cause of action is now fully briefed before

the Court, the Court will assume the sufficiency of Plaintiff's pleading and proceed to

an evaluation on the merits.

    2.    <u>Plaintiff Cannot Prove the Uniformity of its Alleged Commercial
Designation</u>

The Court finds that the definitions of plywood found in the industry standard

publications for hardwood and softwood plywood in 1983 preclude Plaintiff from

proving a uniform commercial designation.  Even if the Court credits the statements of

Plaintiff's expert witnesses as true, and accepts that, in their experience, plywood was

always commercially **defined** as a product that is bought and sold on the basis of the

grades of the veneers used in its construction, the textual definitions demonstrate a lack

of uniformity on that point.  The Court notes that the 1983 ANSI/HPMA hardwood

plywood standard and the 1983 APA softwood plywood standard include abundant

information about grading, **but neither includes a definitional requirement that a**

**product must be bought and sold by grade in order to constitute plywood.**  To the

contrary, the definition of plywood found in each standard is fully consistent with the

(now well established) common meaning of plywood.  Because "[i]n order for a

commercial designation to be uniform, it must be the same throughout the trade," the

Court finds that Plaintiff is incapable of proving uniformity in this case.  Timber

Products Co., 515 F.3d at 1221.

> 3.     Plaintiff Cannot Prove the Definiteness of its Alleged Commercial
>         Designation

        The Court also finds that Plaintiff's commercial designation lacks definiteness.

Plaintiff's proffered commercial designation of plywood is identical to the common

meaning of plywood as established by the courts, with one additional requirement: the

proviso that plywood "is **typically** bought, sold by, manufactured to, **and/or** referenced

to, well-recognized plywood veneer grades . . . **or** by standards agreed upon between

the parties."  (Pl.'s Resp. 26 (emphasis added).)  It is not clear to the Court from this

string of disjunctive possibilities just how essential this added requirement is to

Plaintiff's alleged commercial designation.  Plaintiff further clarifies (or, perhaps,

obfuscates) that a buyer and a seller of plywood could freely agree that the plywood in

a given transaction **does not need** to be linked to "recognized grading standards," and

that under such circumstances "the buyer and/or seller would **typically** have their own

internal standards and an understanding as to the quality of the product being sold."

(Id. (emphasis added).)  The Court finds that Plaintiff's assertion regarding the

necessary connection between plywood and "well-recognized plywood veneer grades"

is equivocal and lacking in definiteness.[16]  It does not spell out with precision the

relationship that plywood has with grading, and it is perfectly conceivable that a

product not linked to any grading standard could fall within the ambit of Plaintiff's

commercial designation.

        The lack of definiteness of Plaintiff's proffered commercial designation stands in

stark contrast to the commercial designations in successful commercial designation

---

[16] The Court identifies the following as a partial list of products that would fit
within Plaintiff's proffered commercial designation:

1.      Products that meet the common meaning of plywood, and are bought and sold
        according to well-recognized plywood veneer grades, or
2.      Products that meet the common meaning of plywood, and are "manufactured
        to" well-recognized plywood veneer grades, or
3.      Products that meet the common meaning of plywood, and are "referenced to"
        well-recognized plywood veneer grades, or
4.      Products that satisfy some combination of (1) – (3), or
5.      Products that meet the common meaning of plywood, and are bought and sold
        according to standards agreed upon by the parties, or
6.      Products that meet the common meaning of plywood, and are manufactured
        according to standards agreed upon by the parties, or
7.      Products that meet the common meaning of plywood, and are referenced to
        standards agreed upon by the parties, or
8.      Products that meet the common meaning of plywood, with no reference to
        grading whatsoever.

cases.   In <u>Florsheim Shoe Co. v. United States</u>, 71 Cust. Ct. 187 (1973), for instance, the

court found that while water buffalo calfskin leather fell within the common meaning of

the term "calf leather," there was a commercial designation for the term that excluded

this product.   Namely, in the wholesale trade, "calf leather" referred "to the leather of

young domesticated cows or cattle within the genus Bos," which excluded water

buffalo.  <u>Florsheim</u>, 71 Cust. Ct. at 191.  In <u>Interocean Chemical & Minerals Corp. v.</u>

<u>United States</u>, 715 F. Supp. 1093 (CIT 1989), the court found that while the common

meaning of the term "crabmeat" would seem to be "the meat of a crab," the term is

commercially used only to refer to a product that "has first been cleaned, shelled and

fully cooked."  <u>Interocean</u>, 715 F. Supp. at 1096.  The precise, succinct, and **definite**

nature of these commercial designations contrast starkly with the vague, lengthy, and

ambiguous commercial designation of plywood here advanced by Plaintiff.  In 1928, the

United States Court of Customs Appeals remarked that "[c]ommercial designation is a

thing often claimed in customs litigation and rarely established."  <u>Jas. Akeroyd</u>, 15. Ct.

Cust. App. at 443.  This maxim has once again proven true.

### Conclusion

For the foregoing reasons, the Court concludes that there is no genuine issue as

to any material fact on either of the remaining causes of action in this case, and

Defendant is entitled to judgment as a matter of law on both the fifth and eighth causes

of action.  It is therefore

     **ORDERED** that Defendant's motion for summary judgment on the fifth and

eighth causes of action is GRANTED, and it is further

     **ORDERED** that Plaintiff's motion for summary judgment on the eighth cause of

action is DENIED, and it is further

     **ORDERED** that the parties shall confer and submit to the court, no later than

Tuesday, August 16, 2011, a proposed judgment in accordance with the opinions issued

in this case, to be entered by the Court.


                              /s/ Gregory W. Carman
                              Gregory W. Carman, Judge

Dated:      July 26, 2011
             New York, NY